Case 1:10-cv-14339
Judge: Ludington, Thomas L
MJ: Binder, Charles E
Filed: 10-28-2010 At 02:57 PM
CMP Joseph J Coyer, et al v. HSBC M
ortgage Services [bks]

1  JOSEPH J & JANET M  COYER
2  878 EAST PREVO ROAD
3  PINCONNING  MI48650
4  *989- 225- 0952*

5          **UNITED STATES DISTRICT COURT**
6  **PAID**  **EASTERN DISTRICT OF MICHIGAN**
7  *BC 000732*

8  **Joseph J & Janet M Coyer**        )        Case # _____
9  Plaintiff,                          )
10                                     )
11  vs.                                )        **ORIGINAL PETITION**
12                                     )
13                                     )
14  **HSBC Mortgage Services**         )
15  Defendant                          )
16  _____ )
17                                              Date: <u>October 28, 2010</u>

18  Comes now, Joseph J & Janet M Coyer, hereinafter referred to as "Petitioner," and moves the

19  court for relief as herein requested:

20                          **PARTIES**
21  Petitioners are Joseph J & Janet M  Coyer, 878 East Prevo Road, Pinconning, MI 48650.

22  Currently known defendant is HSBC Mortgage Services,  PO Box 9068,  Brandon, FL  33509.

23                    **STATEMENT OF CAUSE**
24  Petitioners, Joseph J and Janet M Coyer, entered into a consumer contract for the purchase of a

25  primary residence located at 878 East Prevo Road, Pinconning, MI 48650, hereinafter referred to

26  as the "property."

27  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

28  predatory loan agreement with Defendant.

29  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

30  crafted scheme intended to defraud Petitioner.

31  Defendants failed to make proper notices to Petitioner that would have given Petitioner warning

32  of the types of tactics used by Defendants to defraud Petitioner.

33  Defendants charged false fees to Petitioner at settlement.

34  Defendants used the above referenced false fees to compensate agents of Petitioner in order to

35  induce said agents to breach their fiduciary duty to Petitioner.

ORIGINAL PETITION                                                1 of 25

36   Defendant's attorney caused to be initiated collection procedures, knowing sai collection
37   procedures in the instant action were frivolous as lender is estopped from collection procedures,
38   under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
39   the production of the original promissory note alleged to create a debt.

**IN BRIEF**

40

41   *(Non-factual Statement of Posture and Position)*

42   It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
43   making a number of allegations that, outside the context of the current condition of the real
44   estate industry, may seem somewhat outrageous and counter-intuitive.

45   When Petitioner accuses ordinary individuals of acting in concert and collusion with an
46   ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
47   unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
48   people, just doing what they have been trained to do, are out to swindle the poor
49   unsuspecting borrower.

50   The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
51   committed by people acting in concert and collusion, one with the other.  Petitioner has no
52   reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
53   that what they were doing was part of an ongoing criminal conspiracy, only that it was,
54   and they, at the very least, kept themselves negligently uninformed of the wrongs they
55   were perpetrating.  Petitioner maintains the real culprit is the system itself, including the
56   courts, for failure to strictly enforce the consumer protection laws.

**CAREFULLY CRAFTED CRIMINAL CONNIVANCE**

57

58   *(General State of the Real Estate Industry)*

59   ***THE BEST OF INTENTIONS***

60   Prior to the 1980's and 1990's ample government protections were in place to protect
61   consumers and the lending industry from precisely the disaster we now experience.
62   During President Clinton's administration, under the guise of making housing available to
63   the poor, primary protections were relaxed which had the effect of releasing the
64   unscrupulous on the unwary.

65   Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
66   the risk.  Consequently, Americans were engaged in safe and stable home mortgages.

67   With the protections removed, the unscrupulous lenders swooped in and, instead of
68   making loans available to the poor, used the opportunity to convince the unsophisticated
69   American public to do something that had been traditionally taboo; home buyers were
70   convinced to speculate with their homes, their most important investment.

71   HSBC Mortgage Services , Ameriquest, Countrywide, and many others swooped in and
72   convinced Americans to sell their homes, get out of their safe mortgage agreements, and
73   speculate with the equity they had gained by purchasing homes they could not afford.
74   Lenders created loans intended to fail as, under the newly crafted system, the Lender
75   profited more from a mortgage default than from a stable loan.

76   Companies cropped up who called themselves banks when, in fact, they were only either
77   subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
78   creating and selling promissory notes.  As will be demonstrated, these companies then
79   profited from the failure of the underlying loans.

80   ***HOW IT WORKS***

81   Briefly, how it works is this, the Lender would secure a large loan from a large bank,
82   convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
83   investor.

84   People would set up mortgage companies by securing a large loan from one of the major
85   banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this
86   an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
87   lender who would secure the title from the seller using the borrowed bank funds for that
88   purpose, and then trade the title to the buyer in exchange for a promissory note.

89   The lender then creates a 20 or 30 year mortgage with money the lender must repay within
90   6 months.  As soon as the closing is consummated, the promissory note is sold to an
91   investor pool.

92   Using the instant case as an example, a 182,000.00 note at 9.1840%  interest over 30 years
93   will produce $172,991.21  The lender can then offer to the investor the security instrument
94   (promissory note) at say 50% of it's future value.  The investor will, over the life of the
95   note, less approximately 3.00% servicing fees, realize $261,045.92 .  The lender can then
96   pay back the bank and retain a handsome profit in the amount of $95,193.09.  The lender,
97   however, is not done with the deal.

98  The lender signed over the promissory note to the investor at the time of the trade, but did
99  not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme
100 Court addressed this issue and stated that such a transaction was certainly legal.  However,
101 it created a fatal flaw as the holder of the lien document, at time of sale of the security
102 instrument, received consideration in excess of the lien amount.  Since the lien holder
103 received consideration, he could not be harmed.    Therefore the lien became an
104 unenforceable document.

105 This begs the question: if keeping the lien would render it void, why would the lender not
106 simply transfer the lien with the promissory note?  The reason is because the lender will
107 hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
108 amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
109 liability.  The lender, by this maneuver, gets consideration a second time.  And still the
110 lender is not done profiting from the deal.

111 After sale of the promissory note, the lender remains as the servicer for the investor.  The
112 lender will receive 3% of each payment the lender collects and renders to the investor
113 pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep
114 that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the
115 foreclosure.

116 The lender stands to profit more from a note that is overly expensive, than from a good
117 stable loan.   And where, you may ask, does all this profit come from?  It comes from the
118 equity the borrower had built up in the home.  And still the lender is not finished profiting
119 from the deal.

120 Another nail was driven in the American financial coffin when on the last day Congress
121 was in session in 2000 when restrictions that had been in place since the economic
122 collapse of 1907 were removed.   Until 1907  investors were allowed to bet on stocks
123 without actually buying them.  This unbridled speculation led directly to an economic
124 collapse.  As a result the legislature banned the practice, until the year 2000.  In 2000 the
125 unscrupulous lenders got their way on the last day of the congressional session.  Congress
126 removed the restriction banning derivatives and again allowed the practice, this time
127 taking only 8 years to crash the stock market.   This practice allowed the lender to profit
128 further from the loan by betting on the failure of the security instrument he had just sold to
129 the unwary investor, thus furthering the purpose of the lender to profit from both the
130 borrower (consumer) and the investor.

131  The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
132  bailout at the expense of the taxpayer.   The unsuspecting consumer was lulled into
133  accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
134  were acting under the guise of government regulation and, therefore, the borrower had
135  reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to
136  protect the consumer from just this kind of abuse were simply being ignored.

137  The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
138  the referral of the client to the lender by a person acting as an agent for the borrower.
139  Hereinafter, the person or entity who receives any portion of the yield spread premium, or
140  a commission of any kind consequent to securing the loan agreement through from the
141  borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
142  law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
143  seeking out a lender for the borrower, would seek the best deal for his client rather than
144  who would pay him the most.  That was the intent, but not the reality.  The reality is that
145  Agents never come away from the table with less than 2% or 3% of the principal.  This is
146  accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
147  fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
148  product than the borrower qualifies for.  This will generate more profits for the lender and,
149  consequently, for the Agent.

150  It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
151  the fair market price.  This allows the lender to increase the cost of the loan product and
152  give the impression that the borrower is justified in making the purchase.

153  The lender then charges the borrower an underwriting fee in order to convince the
154  borrower that someone with knowledge has gone over the conditions of the note and
155  certified that they meet all legal criteria.  The trustee, at closing, participates actively in the
156  deception of the borrower by placing undue stress on the borrower to sign the large stack
157  of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to
158  insure the transaction.  This trust is systematically violated for the purpose of taking unfair
159  advantage of the borrower.   The entire loan process is a carefully crafted contrive
160  connivance designed and intended to induce the unsophisticated borrower into accepting a
161  loan product that is beyond the borrowers means to repay.  With all this, it should be a
162  surprise to no one that this country is having a real estate crisis.

ORIGINAL PETITION

## PETITIONER WILL PROVE THE FOLLOWING

Petitioner is prepared to prove, by a preponderance of evidence that:

- Lender has no legal standing to bring collection or foreclosure claims against the property;

- Lender is not a real party in interest in any contract which can claim a collateral interest in the property;

- even if Lender were to prove up a contract to which Lender had standing to enforce against Petitioner, no valid lien exists which would give Lender a claim against the property;

- even if Lender were to prove up a contract to which Lender had standing to enforce against Petitioner,  said contract was fraudulent in its creation as endorsement was secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in the inducement, fraud in the execution, usury, and breaches of contractual and fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of Pooled Assets," "Trustee or officers of Structured Investment Vehicle," "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of 'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans pooled together in a trust fund;

- Defendants have concocted a carefully crafted connivance wherein Lender conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property by inducing Plaintiff to enter into a predatory loan inflated loan product;

- Lender received unjust enrichment in the amount of 5% of each payment made late to Lender while Lender and Lender's assigns acted as servicer of the note;

- Lender and Lender's assigns, who acted as servicer in place of Lender, profited by handling the foreclosure process on a contract Lender designed to have a high probability of default;

- Lender intended to defraud Investor by converting the promissory note into a security instrument and selling same to Investor;

ORIGINAL PETITION

193  • Lender intended to defraud Investor and the taxpayers of the United States by
194    withholding the lien document from the sale of the promissory note in order that
195    Lender could then hold the lien for three years, then prepare and file Internal
196    Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
197    and deduct same from Lender's income tax obligation;

198  • Lender defrauded backers of derivatives by betting on the failure of the promissory
199    note the lender designed to default;

200  • participant Defendants, et al, in the securitization scheme described herein have
201    devised business plans to reap millions of dollars in profits at the expense of
202    Petitioner and others similarly situated.

203                    **PETITIONER SEEKS REMEDY**
204  In addition to seeking compensatory, consequential and other damages, Petitioner seeks
205  declaratory relief as to what (if any) party, entity or individual or group thereof is the
206  owner of the promissory note executed at the time of the loan closing, and whether the
207  Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
208  Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
209  alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

210  *PETITIONER HAS BEEN HARMED*

211  Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

212  Such harm and detriment includes economic and non-economic damages, and injuries to
213  Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

214  In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
215  equitable relief requested herein is granted.

216                    **STATEMENT OF CLAIM**

217  *DEFENDANTS  LACK STANDING*

218        **No evidence of Contractual Obligation**

219  Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
220  produce said contract.  Even if Defendants produced evidence of the existence of said contract in

ORIGINAL PETITION

the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence that a contract actually existed at one point in time. A copy, considering the present state of technology, could be easily altered. As Lender only created one original and that original was left in the custody of Lender, it was imperative that Lender protect said instrument.

In as much as the Lender is required to present the original on demand of Petitioner, there can be no presumption of regularity when the original is not so produced. In as much as Lender has refused Petitioner's request of the chain of custody of the security instrument in question by refusing to identify all current and past real parties in interest, there is no way to follow said chain of custody to insure, by verified testimony, that no alterations to the original provisions in the contract have been made. Therefore, the alleged copy of the original is only hearsay evidence that an original document at one time existed. Petitioner maintains that, absent production of admissible evidence of a contractual obligation on the part of Petitioner, Defendants are without standing to invoke the subject matter jurisdiction of the court.

### No Proper Evidence of Agency

Defendants claim agency to represent the principal in a contractual agreement involving Petitioner, however, Defendants have failed to provide any evidence of said agency other than a pronouncement that agency has been assigned by some person, the true identity and capacity of whom has not been established. Defendants can hardly claim to be agents of a principal then refuse to identify said principal. All claims of agency are made from the mouth of the agent with no attempt to provide admissible evidence from the principal.

Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the court.

### Special Purpose Vehicle

Since the entity now claiming agency to represent the holder of the security instrument is not the original lender, Petitioner has reason to believe that the promissory note, upon consummation of the contract, was converted to a security and sold into a special purpose vehicle and now resides in a Real Estate Mortgage Investment Conduit (REMIC) as defined by the Internal Revenue Code and as such, cannot be removed from the REMIC as such would be a prohibited transaction. If the mortgage was part of a special purpose vehicle and was removed on consideration of foreclosure, the real party in interest would necessarily be the trustee of the

251  special purpose vehicle.  Nothing in the pleadings of Defendants indicates the existence of a
252  special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
253  cause to believe defendant is not the proper agent of the real party in interest.

254  ### *CRIMINAL CONSPIRACY AND THEFT*

255  Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
256  a criminal conspiracy to defraud Petitioner.  Said conspiracy but are not limited to acts of
257  negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
258  acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
259  Petitioner by Lender, which were then used to fund the improper payment of commission fees to
260  Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

261  ### *AGENT PRACTICED UP-SELLING*

262  By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so
263  doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
264  that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose
265  Agent's conspiratorial relationship to Lender,  Agent violated Agent's fiduciary duty to
266  Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
267  connivances, wherein Agent proactively made knowingly false and misleading statements of
268  alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
269  Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
270  a loan product offered by the Lender.  Said loan product was more expensive than Petitioner
271  could legally afford. Agent acted with full knowledge that Petitioner would have made a
272  different decision had Agent given complete disclosure.

273  ### *FRAUDULENT INDUCEMENT*

274  Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
275  known, Petitioner could not afford in order to unjustly enrich Lender.

276  ### *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

277  Said more expensive loan product was calculated to produce a higher return when sold as a
278  security to an investor who was already waiting to purchase the loan as soon as it could be
279  consummated.

280        **Extra Commission for Late Payments**

281    Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
282    that Lender intended Petitioner would have difficulty paying.  The industry standard payment to
283    the servicer for servicing a mortgage note is 3% of the amount collected.  However, if the
284    borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
285    Thereby, the Lender stands to receive more than double the regular commission on collections if
286    the borrower pays late.

287        **Extra Income for Handling Foreclosure**

288    Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
289    on which Lender intended petitioner to default.  In case of default, the Lender, acting as servicer,
290    receives considerable funds for handling and executing the foreclosure process.

291        **Credit Default Swap Gambling**

292    Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
293    default swap, commonly referred to as a derivative as addressed more fully below.  Since Lender
294    designed the loan to fail, betting on said failure is essentially a sure thing.

295    ***LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN***

296    Lender sold the security instrument after closing and received consideration in an amount in
297    excess of the lien held by Lender.  Since Lender retained the lien document upon the sale of the
298    security instrument, Lender separated the lien from said security instrument, creating a fatal and
299    irreparable flaw.

300    When Lender received consideration while still holding the lien and said consideration was in
301    excess of the amount of the lien, Lender was in a position such that he could not be harmed and
302    could not gain standing to enforce the lien.  The lien was, thereby, rendered void.

303    Since the separation of the lien from the security instrument creates such a considerable concern,
304    said separation certainly begs a question: "Why would the Lender retain the lien when selling the
305    security instrument?"

306   When you follow the money the answer is clear.  The Lender will hold the lien for three years,
307   then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
308   the full amount from Lender's tax liability, thereby, receiving consideration a second time.

309   Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
310   lien to the holder of the security, however, the lien once satisfied, does not gain authority just
311   because the holder, after receiving consideration, decides to transfer it to someone else.

312   ***LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES***

313   Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
314   information that Lender had as a result of creating the faulty loans sure to default.  Lender was
315   then free to invest on the bet that said loan would default and stood to receive unjust enrichment
316   a third time.  This credit default swap derivative market scheme is almost totally responsible for
317   the stock market disaster we now experience as it was responsible for the stock market crash in
318   1907.

319   ***LENDER CHARGED FALSE FEES***

320   Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
321   Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
322   vendor.

323   Lender charged other fees that were a normal part of doing business and should have been
324   included in the finance charge.

325   Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time
326   did Lender or Trustee provide documentation to show that the fees herein listed were valid,
327   necessary, reasonable, and proper to charge Petitioner.

| 808 | Tax Service Contract Fee | $65.00 |
|---|---|---|
| 809 | Flood Certification Fee | $12.00 |
| 810 | Underwriting Fee | $650.00 |
| 811 | Processing Fee | $595.00 |
| 812 | Funding Fee | $50.00 |
| 901 | Interest | $276.01 |
| 1101 | Settlement fee | $275.00 |
| 1111 | Loan Policy Simultaneous | $368.80 |
| 1201 | Recording Fee | $62.00 |

328   Debtor is unable to determine whether or not the above fees are valid in accordance with the
329   restrictions provided by the various consumer protection laws.   Therefore, please provide; a
330   complete billing from each vendor who provided the above listed services; the complete contact
331   information for each vendor who provided a billed service; clearly stipulate as to the specific
332   service performed; a showing that said service was necessary; a showing that the cost of said
333   service is reasonable; a showing of why said service is not a regular cost of doing business that
334   should rightly be included in the finance charge.

335   The above charges are hereby disputed and deemed unreasonable until such time as said charges
336   have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
337   restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

338   In the event lender fails to properly document the above charges, borrower will consider same as
339   false charges.   The effect of the above amounts that borrower would pay over the life of the note
340   will be an overpayment of $183,247.80   This amount will be reduced by the amount of items
341   above when said items are fully documented.

342   ***RESPA PENALTY***

343   From a cursory examination of the records, with the few available, the apparent RESPA
344   violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In
345   Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
346   presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
347   No 1st Payment Letter.

348   The closing documents included no signed and dated :  Financial Privacy Act Disclosure; Equal
349   Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
350   statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
351   disclosure letter; loan discount fee disclosure; business insurance company arrangement
352   disclosure; notice of right to rescind.

353   The courts have held that the borrower does not have to show harm to claim a violation of the
354   Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance.  And,
355   in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
356   no more than two thousand, considering the large number enumerated here, it is reasonable to
357   consider that the court will assess the maximum amount for each violation.

358   Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
359   the note, borrower has calculated that, the number of violations found in a cursory examination
360   of the note, if deducted from the principal, would result in an overpayment on the part of the
361   borrower, over the life of the note, of $246,162.52.

362   If the violation penalty amounts for each of the unsupported fees listed above are included, the
363   amount by which the borrower would be defrauded is $302,086.22

364   Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
365   variance, it appears that lender intended to defraud borrower in the amount of $966,071.39

### *LENDER CONSPIRED WITH APPRAISER*

366

367   Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
368   purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
369   duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
370   inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
371   Petitioner.

### *LENDER CONSPIRED WITH TRUSTEE*

372

373   Lender conspired with the trust Agent at closing to create a condition of stress for the specific
374   purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
375   fully understand what was being signed.

376   The above referenced closing procedure was a carefully crafted connivance, designed and
377   intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
378   to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
379   did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
380   as required by various consumer protection statutes.

### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

381

382   In the manner in which Defendants have carried on their business enterprises, they have engaged
383   in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
384   (Deceptive Practices Act).

385   Such conduct comprises a pattern of business activity within the meaning of such statutes, and
386   has directly and proximately caused Petitioner to suffer economic and non-economic harm and
387   detriment in an amount to be shown according to proof at trial of this matter.

388   ***EQUITABLE TOLLING FOR TILA AND RESPA***

389   The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
390   Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

391   Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
392   *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
393   are subject to a one-year limitations period; however, such claims are subject to the equitable
394   tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
395   subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
396   that given the remedial purpose of TILA, the limitations period should run from the date of
397   consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
398   circumstances, suspend the limitations period until the borrower discovers or has reasonable
399   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
400   *v. California, 784 F.2d 910, 915 9t*h Cir. 1986).

401   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
402   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
403   that such limitations period may be equitably tolled. The Court of Appeals for the District of
404   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*
405   *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
406   opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
407   *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
408   that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
409   *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
410   *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
411   interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
412   language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
413   of precedential value, this Court has previously found both the TILA and **RESPA** limitations
414   periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
415   *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

416   The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay

417   by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the

418   existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*

419   *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*

420   Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on

421   any wrongful conduct by the Defendants. Santa Maria. at 1178.

### BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING STANDARDS

424   Traditionally, Lenders required borrowers seeking mortgage loans to document their income and

425   assets by, for example, providing W-2 statements, tax returns, bank statements, documents

426   evidencing title, employment information, and other information and documentation that could

427   be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's

428   ability to repay a particular loan over both the short and long term. Defendants deviated from and

429   disregarded these standards, particularly with regard to its riskier and more profitable loan

430   products.

**431   Low-Documentation/No-Documentation Loans.**

432   Driven by its desire for market share and a perceived need to maintain competitiveness with the

433   likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no

434   documentation loan products, including the HARMs and HELOCs described hereinabove, and

435   began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to

436   the already eased underwriting standards to the point of disregarding such standards. This

437   quickened the loan origination process, allowing for the generation of more and more loans

438   which could then be resold and/or securitized in the secondary market.

439   Defendants marketed no-documentation/low-documentation loan programs that included

440   HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated

441   income" or "stated assets" (SISA) neither of which were verified. Employment was verbally

442   confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,

443   was to be roughly consistent with incomes in the types of jobs in which the borrower was

444   employed. When borrowers were requested to document their income, they were able to do so

445   through information that was less reliable than in a full-documentation loan.

446   For stated income loans, it became standard practice for loan processors, loan officers and
447   underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
448   income loans, emphasizing loan origination from a profitability standpoint at the expense of
449   determining the ability of the borrower to repay the loan from an underwriting standpoint,
450   encouraged the overstating and/or fabrication of income.

451   **Easing of Underwriting Standards**

452   In order to produce more loans that could be resold in the secondary mortgage market,
453   Defendants also relaxed, and often disregarded, traditional underwriting standards used to
454   separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
455   the base FICO score needed for a SISA loan.

456   Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
457   used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
458   loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
459   income ratios (the amount of monthly income compared to monthly debt service payments and
460   other monthly payment obligations.

461   With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
462   term financial circumstances, approving the loan based on the initial fixed rate without taking
463   into account whether the borrower could afford the substantially higher payment that would
464   inevitably be required during the remaining term of the loan.

465   With respect to HELOCs, Defendants underwrote and approved such loans based only on the
466   borrower's ability to afford the interest-only payment during the initial draw period of the loan,
467   rather than on the borrower's ability to afford the subsequent, fully amortized principal and
468   interest payments.

469   As Defendants pushed to expand market share, they eased other basic underwriting standards.
470   For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
471   allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
472   eased underwriting standards the Defendants also were encouraging consumers to go further into
473   debt in order to supply the very lucrative aftermarket of mortgage backed securities.  The relaxed
474   underwriting standards created the aftermarket supply they needed. As a result, the Defendants
475   made it easy for the unwary consumer to take on more debt than he could afford by encouraging

476   unsound financial practices, all the while knowing defaults would occur more and more
477   frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
478   standards.

479   Defendants knew, or in the exercise of reasonable care should have known, from its own
480   underwriting guidelines industry standards that it was accumulating and selling/reselling risky
481   loans that were likely to end up in default. However, as the pressure mounted to increase market
482   share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
483   underwriting guidelines. Such was the environment that loan officers and underwriters were,
484   from time to time, placed in the position of having to justify why they did not approve a loan that
485   failed to meet underwriting criteria.

486   **Risk Layering**

487   Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
488   loans with one or more relaxed underwriting standards.

489   Defendants knew, or in the exercise of reasonable care should have known, that layered risk
490   would increase the likelihood of default. Among the risk layering Defendants engaged in were
491   approving HARM loans with little to no down payment, little to no documentation, and high
492   DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
493   the loans it promoted to borrowers.

494   Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
495   mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
496   believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
497   business ignored basic established underwriting standards and acted to mislead the borrower, all
498   to the detriment of the borrower and the consumer of loan products..

499   Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
500   engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
501   business practices described above in paragraphs 30-42 of this Complaint

502   ***UNJUST ENRICHMENT***

503   Petitioner is informed and believes that each and all of the Defendants received a benefit at
504   Petitioner's expense, including but not limited to the following: To the Agent, commissions,

505  yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to

506  be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,

507  surcharges and other "back end" payments in amounts to be proved at trial; To the investors,

508  resale premiums, and high rates of return; To the servicers including EMS, servicing fees,

509  percentages of payment proceeds, charges, and other "back end" payments in amounts to be

510  proved at trial; To all participants, the expectation of future revenues from charges, penalties and

511  fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

512  By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,

513  and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly

514  deprived, and is entitled to restitution in the amount of $966,071.39

515  ***CLAIM TO QUIET TITLE.***

516  Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and

517  the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title

518  interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission

519  and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

520  Defendants have no title, estate, lien, or interest in the Subject Property in that the purported

521  power of sale contained in the Deed of Trust is of no force or effect because Defendants' security

522  interest in the Subject Property has been rendered void and that the Defendants are not the holder

523  in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'

524  involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

525  "a Petitioner is entitled to damages from those Defendants who concur in the tortuous
526  scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co.*, 24 Cal.
527  3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); *Novartis Vaccines and Diagnostics, Inc.*
528  *v. Stop Huntingdon Animal Cruelty USA, Inc.*, 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d
529  27 (1st Dist. 2006); *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 47 Cal.
530  Rptr. 2d 752 (2d Dist. 1995).

531  ***SUFFICIENCY OF PLEADING***

532  Petitioner has sufficiently pled that relief can be granted on each and every one of the

533  Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond

534  doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would

535  entitle Petitioner to relief." *Housley v. U.S.* (9th Cir. Nev. 1994) 35 F.3d 400, 401. "All

536 allegations of material fact in the complaint are taken as true and construed in the light most
537 favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

538 Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
539 8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
540 theories, and seeks remedies to which Petitioner is entitled.  *Balistreri v. Pacifica Police Dept., 901 F.2d*
541 *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
542 conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
543 should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
544 Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
545 their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
546 relief as requested herein should be granted.

547 ## CAUSES OF ACTION

548 ### *BREACH OF FIDUCIARY DUTY*

549 Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
550 duty of care with respect to the mortgage loan transactions and related title activities involving
551 the Trust Property.

552 Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
553 breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
554 all applicable laws governing the loan transactions in which they were involved, including but
555 not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

556 Defendant's breaches of said duties were a direct and proximate cause of economic and non-
557 economic harm and detriment to Petitioner(s).

558 Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
559 all to be shown according to proof at trial of this matter.

560 ### *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

561 Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
562 duty to properly perform due diligence as to the loans and related transactional issues described
563 hereinabove.

564   In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
565   X and Z promulgated there under to, among other things, provide proper disclosures concerning
566   the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
567   or should have known that borrowers could not afford or maintain, and to avoid paying undue
568   compensation such as "yield spread premiums" to mortgage Agents and loan officers.

569   Defendants knew or in the exercise of reasonable care should have known, that the loan
570   transactions involving Petitioner and other persons similarly situated were defective, unlawful,
571   violative of federal and state laws and regulations, and would subject Petitioner to economic and
572   non-economic harm and other detriment.

573   Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
574   Z promulgated there under were intended and designed to protect, and the conduct alleged
575   against Defendants is the type of conduct and harm which the referenced statutes and regulations
576   were designed to deter.

577   As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
578   non-economic harm in an amount to be shown according to proof at trial.

579   *AGENT: COMMON LAW FRAUD*

580   If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
581   negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
582   ground for believing them to be true.

583   Agents made these representations with the intention of inducing Petitioner to act in reliance on
584   these representations in the manner hereafter alleged, or with the expectation that Petitioner
585   would so act.

586   Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
587   in their negligent misrepresentation, and that various Agents were negligent in not implementing
588   procedures such as underwriting standards oversight that would have prevented various Agents
589   from facilitating the irresponsible and wrongful misrepresentations of various Agents to
590   Defendants.

591   Petitioner is informed and believes that Agent acted in concert and collusion with others named
592   herein in promulgating false representations to cause Petitioner to enter into the LOAN without
593   knowledge or understanding of the terms thereof.

594   As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
595   Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
596   opportunities, attorney fees and costs, and other damages to be determined at trial. As a
597   proximate result of Agents' breach of duty and all other actions as alleged herein, Plaintiff has
598   suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
599   mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
600   at trial.

601   ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
602   ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

603   Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
604   fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
605   performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
606   *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
607   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
608   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

609   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
610   particular significance, in part because of the special relationship between the insurer and the
611   insured. The insurer, when determining whether to settle a claim, must give at least as much
612   consideration to the welfare of its insured as it gives to its own interests. . . The standard is
613   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

614   Likewise, there is a special relationship between an Agent and borrower. "A person who
615   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
616   otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
617   consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
618   be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
619   *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
620   *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."

ORIGINAL PETITION                                                                21 of 25

621 (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).

622 [*Emphasis Added*].

623 All Defendants, willfully breached their implied covenant of good faith and fair dealing with

624 Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to

625 provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan

626 product without regard for other more affordable products; (4) Placed Petitioner into a loan

627 without following proper underwriting standards; (5) Failed to disclose to Petitioner that

628 Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform

629 valid and /or properly documented substitutions and assignments so that Petitioner could

630 ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's

631 request for documentation of the servicing of Petitioner's loan and the existence and content of

632 relevant documents. Additionally, Defendants breached their implied covenant of good faith and

633 fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the

634 right under an alleged power of sale because the purported assignment was not recorded and by

635 willfully and knowingly financially profiting from their malfeasance. Therefore, due to the

636 special relationship inherent in a real estate transaction between Agent and borrower, *and* all

637 Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

638 ### *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*

639 ### *SEQ*

640 Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation

641 contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of

642 Action as though the same were set forth herein.

643 Petitioner is informed and believes that Defendant's violation of the provisions of law rendered

644 the credit transaction null and void, invalidates Defendant's claimed interest in the Subject

645 Property, and entitles Petitioner to damages as proven at trial.

646 ### *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

647 The conduct committed by Defendants, driven as it was by profit at the expense of increasingly

648 highly leveraged and vulnerable consumers who placed their faith and trust in the superior

649 knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by

650 civilized society.

ORIGINAL PETITION

651   Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
652   distress, or acted in conscious and/or reckless disregard of the probability that such distress
653   would occur.

654   Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
655   conduct of Defendants as described hereinabove.

656   As a result of such severe emotional distress, Petitioner suffered economic and non economic
657   harm and detriment, all to be shown according to proof at trial of this matter.

658   Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
659   Petitioner and secure to Petitioner quite title;

660   Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
661   as payments to Defendants based on the fraudulently secured promissory note in an amount to be
662   calculated by Defendants and verified to Petitioner;

663   Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
664   amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
665   equal to $2,898,214.17

666                                   **PRAYER**
667   WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,
668   as follows:

669           For an emergency restraining order enjoining lender and any successor in interest from
670           foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth
671           herein;

672           For a permanent injunction enjoining Defendants from engaging in the fraudulent,
673           deceptive, predatory and negligent acts and practices alleged herein;

674           For quiet title to Property;

675           For rescission of the loan contract and restitution by Defendants to Petitioner according
676           to proof at trial;

677           For disgorgement of all amounts wrongfully acquired by Defendants according to proof
678           at trial;

679           For actual monetary damages in the amount $966,071.39;

680          For pain and suffering due to extreme mental anguish in an amount to be determined at

681          trial.

682          For pre-judgment and post-judgment interest according to proof at trial;

683          For punitive damages according to proof at trial in an amount equal to $2,898,214.17.

684          For attorney's fees and costs as provided by statute; and,

685          For such other relief as the Court deems just and proper.

686    Respectfully Submitted,

687

688

689

690

691    **Joseph J Coyer**                  **Janet M Coyer**

692
693
694
695
696
697
698
699
700
701
702
703
704
705
706
707
708
709
710
711
712
713
714
715
716
717
718
719
720
721
722
723
724

ORIGINAL PETITION

725 JOSEPH J & JANET M  COYER
726 878 EAST PREVO ROAD
727 PINCONNING  MI48650
728
729                    UNITED STATES DISTRICT COURT
730                    EASTERN DISTRICT OF MICHIGAN
731
732
733 **Joseph J & Janet M Coyer**        )    Case # 10-14339
734 Plaintiff,                          )
735                                     )
736 vs.                                 )    **DEMAND FOR JURY TRIAL**
737                                     )
738                                     )
739 **HSBC Mortgage Services**          )
740 Defendant                           )
741 _____ )
742                                          Date: October 28,2010

743
744
745             PLAINTIFF'S DEMAND FOR JURY TRIAL

746   Plaintiff, Joseph J & Janet M  Coyer, assert their rights under the Seventh Amendment to the

747   U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by

748   jury on all issues.

749   Respectfully Submitted,

750
751
752
753   Joseph J Coyer                    Janet M  Coyer
754

§JS 44 (Rev. 12/07) **CIVIL COV**

Case 1:10-cv-14339
Judge: Ludington, Thomas L
MJ: Binder, Charles E
Filed: 10-28-2010 At 02:57 PM
CMP Joseph J Coyer, et al v. HSBC M
ortgage Services [bks]

The JS 44 civil cover sheet and the information contained herein neither replace nor supp    t as provided
by local rules of court. This form, approved by the Judicial Conference of the United Sta    : of initiating
the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Joseph J & anet M Coyer

**DEFENDANTS**

HSBC Mortgage Services

**(b)** County of Residence of First Listed Plaintiff    Bay
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

filing pro-se, without an attorney

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☒ 210 Land Condemnation
- ☒ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

*PERSONAL INJURY*
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

*PERSONAL INJURY*
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
*Habeas Corpus:*
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
TILA (15 U.S.C. 1601) & RESPA (12 U.S.C. 2601)
Brief description of cause:
mortgage fraud

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $
2,898,214.17

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE                     DOCKET NUMBER

DATE
10/28/10

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____